UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-80856-CIV-MARRA/HOPKINS

AMY HACKNEY,

Plaintiff,

vs.

JACK DAUBERT, M.D., P.A. d/b/a
FLORIDA VISION INSTITUTE,

Defendant.

_____/

## OPINION AND ORDER

This cause is before the Court upon Defendant Florida Vision Institute's Motion for Final

Summary Judgment (DE 42).  The motion is fully briefed and ripe for review.  The Court has

carefully considered the motion and is otherwise fully advised in the premises.

I.  Background

The facts, as culled from affidavits, exhibits, depositions, answers, answers to

interrogatories and reasonably inferred therefrom in a light most favorable to the non-moving

party, for the purpose of this motion, are as follows:

Defendant Florida Vision ("Defendant") is a medical practice specializing in

ophthalmology and Lasik, located in the cities of Stuart, West Palm Beach and Jupiter, Florida.

(David Lee Lienhardt Dep. 4-5, 33-34, App. A, DE 43-1.)   The primary office is in Stuart.

David Lee Lienhardt is Defendant's Chief Executive Officer and Administrator. (Id. at 4-5.)   In

April of 2011, Defendant had a job opening for a front desk position in the West Palm Beach

office.  (Samantha-Jayne Hudnall Dep. 8, App. B, DE 43-1.)  At that time, Samantha-Jayne

Hudnall was the senior front desk person in the West Palm Beach office. (Id. at 6-7.)   Ms. Hudnall's immediate supervisor, Erin Shabareck, is based in the Stuart office. (Id. at 13.)  Ms. Shabareck is the manager of the billing department and manager of the front desks at all of Defendant's locations.  (Erin Shabareck Dep. 4, App. H, DE 43-1.)  She occasionally worked from the West Palm Beach office. (Pl. Aff. ¶ 7.)

Ms. Hudnall and Plaintiff, Amy Hackney ("Plaintiff"), were next door neighbors. Plaintiff told Ms. Hudnall that she was unhappy in her current job and asked Ms. Hudnall to submit her resume to Defendant.  Ms. Hudnall gave the resume to Ms. Shabareck. (Hudnall Dep. 9-10.)  Mr. Leinhardt participated in interviewing Plaintiff for the job opening. (Leinhardt Dep. 22.)  Defendant hired Plaintiff for a front desk position at the West Palm Beach Office. (Hudnall Dep. 12.)   Plaintiff assumed Ms. Hudnall's position when Ms. Hudnall left her employment for Defendant on or about May 27, 2011. (Pl. Aff.  ¶ 3.)

Plaintiff's employment began April 21, 2011 on a part-time basis, and she became a full-time employee on May 9, 2011. (Pl. Aff. ¶ 1, Ex. B, DE 54-2.)  The first 90 days of employment is a probationary period for all of Defendant's employees. (Leinhardt Dep. 12; Employee Handbook at 5, App. J, DE 43-1.)  Probationary employees are not eligible for benefits, holiday pay or unemployment compensation if terminated within the probationary period, and Defendant reserves the right to terminate employment during the probationary period.  (Employee Handbook at 5-6.)  Plaintiff was a probationary employee during her entire tenure with Defendant. (Leinhardt Dep. 22.)  Plaintiff was not given an employment contract and understood she was an "at-will" employee. (Pl. Aff.  ¶ 2.)  Defendant's employee handbook states "[y]our employment here is always at will and you or our organization can end your employment at any

time for any reason, or for no reason." (Introduction to Employee Handbook, Ex. A, DE 54-1.)

The front desk at the West Palm Beach office has three principal staff positions - a check-in position, a check-out position and the "third person." (Hudnall Dep. 17; Julia Borghese Dep. 36, App. C, DE 43-1.) Plaintiff was hired as the third person. (Hudnall Dep. 18; Jenny Frank Dep. 11, App. E, DE 43-1.) Julia Borghese was already employed as the check-out person, and Jenny Frank was hired as the check-in person about the time Plaintiff was hired. (Borghese Dep. 36; Hudnall Dep. 7.) Ms. Hudnall was responsible for Plaintiff's two-week training. (Hudnall Dep. 12; Pl. Aff. ¶ 3.) Ms. Hudnall was also training Jenny Frank as the check-in person. (Hudnall Dep. 16-18; Frank Dep. 11-12.) Plaintiff's job duties as the third person consisted primarily of pulling and preparing patient charts, verifying insurance information, answering telephones and dealing with patients. (Hudnall Dep. 12; Frank Dep. 13.)

According to Ms. Hudnall, during Plaintiff's two-week training, there were difficulties with Plaintiff's ability to perform effectively as well as her ability to get along with other employees. (Hudnall Dep. 18-20, 34-35.) Ms. Hudnall observed that Plaintiff had a difficult time listening and following authority. She did not take direction well and appeared "frazzled," "overwhelmed" and could not keep up with getting her work done. Plaintiff unnecessarily attempted to take on tasks that were not her responsibility and was disorganized and created more work for herself. (Id. at 14-16, 18-19, 26.) Ms. Hudnall spoke with Plaintiff about these issues with her work, but according to Ms. Hudnall, these problems became worse rather than improved. (Id. at 15, 24-25.) Ms. Hudnall also testified that Plaintiff was a source of "strife" in the workplace and caused issues with other employees. (Id. at 20.) The other employees told Ms. Hudnall that Plaintiff bossed them around and was rude to them. They reported that Plaintiff

3

acted like she was the "head honcho" and her attitude was that everybody should listen to what she has to say.  As a result, Ms. Hudnall concluded that Plaintiff was not a team player. (Id. at 20-21.)  Ms. Hudnall described Plaintiff as "leering" around other people's conversations as if she was "paranoid" that other people were talking about her.  In other respects, Plaintiff seemed "paranoid" in that she constantly asked Ms. Hudnall how she was doing in her job.  (Id. at 22, 24.)

Plaintiff's conversation and comments in the office often made others "uncomfortable." (Id. at 21.)   Ms. Hudnall testified to what she characterized as Plaintiff's "inappropriate fixation" with Mr. Leinhardt.  Plaintiff openly spoke of his good looks, his smell, his cologne and her "connection" with him.  She was extremely "jumpy" when he called or came to the West Palm Beach office. Ms. Hudnall found Plaintiff's open fixation with Mr.  Leinhardt to be "disgusting" and "weird." (Id. at 36-38.)  Both Ms. Borghese and Cindy Ralph, a surgical coordinator, confirmed that Plaintiff spoke about Mr. Leinhardt in an inappropriate manner. (Borghese Dep. 8-9; C. Ralph Dep. 19, 24, App. D, DE 43-1.)  Several of the employees in the West Palm Beach office, including Julia Borghese, Cindy Ralph, Tayna Cosme, Walli Santos and Dr. Daubert's scribe, Brian, all complained to Ms. Hudnall about Plaintiff. (Hudnall Dep. 20, 34-35, 54.)

Ms. Borghese, who worked with Plaintiff at the front desk, complained to Ms. Hudnall that Plaintiff was "rude" and "bossy" and told Ms. Hudnall that she did not like working with her. (Id. at  28-29.)  Ms. Borghese told Ms. Hudnall that Plaintiff was not getting her work completed. (Id. at 27-28.)  Ms. Borghese also told Ms. Hudnall that she didn't want to work with Plaintiff and Defendant should get somebody to replace Plaintiff as she was not meshing with the other office staff. (Id. at 30.)  Ms. Borghese stated that she did not want to be left with Plaintiff. (Id. at

4

28.)  Cindy Ralph also complained to Ms. Hudnall about Plaintiff.  For example, Plaintiff asked

her what she was paid and other personal questions. Cindy Ralph told Ms. Hudnall that Plaintiff

was very "unprofessional." (Id. at 30.)

Before Ms. Hudnall left Defendant's employ, Ms. Borghese and others in the West Palm

Beach office asked Ms. Hudnall to talk to Ms. Shabareck, about their problems with Plaintiff.

(Id. at 39-40.)  Had Ms. Hudnall remained an employee, she would have recommended that

Plaintiff be terminated based solely on her job performance and her lack of ability to get along

with her fellow workers.  (Id. at 62-63.)

On or about May 30, 2011, Ms. Hudnall had a telephone conversation with Ms.

Shabareck about the problems with Plaintiff in the West Palm Beach office.[1] (Hudnall Dep. 39-

42.)  Ms. Shabareck told Ms. Hudnall that she would call the "girls" in the West Palm Beach

office in order to deal with the situation, and that Ms. Hudnall she should have reported this

sooner. (Hudnall Dep. 41.)   Later that week, Ms. Shabareck and Ms. Hudnall had a lunch

meeting.  During that meeting, Ms. Shabareck stated that she had spoken with the "girls" in the

West Palm Beach office and confirmed the problems that they were having with Plaintiff and that

Plaintiff would need to be replaced.  (Hudnall Dep. 44-45.)

Specifically, Ms. Borghese, the check-in person, testified that Ms. Shabareck called her at

the West Palm Beach office and asked if she had any problems with Plaintiff. (Borghese Dep. 18,

---

[1] Plaintiff points out that Ms. Shabareck was unaware of any of these alleged problems
with Plaintiff until Ms. Hudnall left Defendant's employ. (Shabareck Dep. 74.)  Plaintiff also
observes that Ms. Shabareck's notes of the meeting show that the meeting took place on May 27,
2011 (Notes, Ex. C, DE 54-4).  On the other hand, Ms. Hudnall's testimony reflects that she first
reported the alleged problems with Plaintiff to Ms. Shabareck over the telephone on May 30,
2011 and she did not meet with Ms. Hudnall until June 3, 2011 (Hudnell Dep. 40-41, 45.)

45.)  In response to a question posed by Ms. Shabareck, Ms. Borghese testified that she would quit if Plaintiff remained working there.[2] (Id. at 18-19, 45-46.)  She described Plaintiff as "pushy," "abrasive," "frantic" and that she rubbed people the wrong way. (Id. at 8-13, 16, 20-23.) For example, Plaintiff would involve herself in matters that were not her business nor part of her job. (Id. at 9, 14-16, 20.)  She also considered Plaintiff's comments about Mr. Leinhardt to be "strange" and "inappropriate."[3] (Id. at 15.)

Cindy Ralph testified that Ms. Shabareck called her at the West Palm Beach office and asked if she had any problems with Plaintiff. (C. Ralph Dep. 31-33.) Cindy Ralph had problems with the quality of Plaintiff's work, stating that Plaintiff was making a lot of "mistakes." (Id. at 12.)  The mistakes consisted of inaccurately booking appointments. (Id. at 12-15, 38-39) and incorrectly entering insurance information (Id. at 16-18, 37-38). Cindy Ralph reported this to Ms. Shabareck on more than one occasion, and she asked that Ms. Shabareck do something to correct the situation.  (Id. at 14-17, 28.)  Ms. Hudnall replied that Plaintiff's mistakes continued despite Ms. Hudnall's training and attempts to instruct Plaintiff. (Id. at 34-36.)  Similarly, Ms. Borghese told Cindy Ralph of Ms. Borghese's frustration that she (Ms. Borghese) was having to do some of Plaintiff's work because Plaintiff was not doing her job. (Id. at 34-36.)  Beyond issues related to Ms. Hackney's job performance, Cindy Ralph was bothered by what she describes as Ms. Hackney's "inappropriate" questioning of how much she earned as a surgical coordinator. Cindy

---

[2] Plaintiff notes that, in another portion of her deposition testimony, Ms. Borghese stated that she never told anyone that she was going to quit her job. (Borghese Dep. 13.)

[3] Ms. Borghese was no longer an employee of Defendant's when she was deposed. (Borghese Dep 4-5.)

Ralph considered this information to be "personal."[4] (Id. at 19-20, 23.)  In response to Cindy

Ralph's complaint, Ms. Shabareck sent Plaintiff an intra-office email on June 1, 2011 advising

Plaintiff that she should not discuss payroll issues with other employees. (June 1, 2011 email,

App. K, DE 43-1.) Cindy Ralph was likewise bothered by Plaintiff's comments about Mr.

Leinhardt. (C. Ralph Dep. 19, 24-25.) Cindy Ralph stated that "everybody" who worked in the

West Palm Beach office spoke of problems with Plaintiff. (C. Ralph Dep. 34.)

      Jenny Frank, the check-out person, testified that Ms. Shabareck called her at the West

Palm Beach office and asked if she had any problems with Plaintiff. (Jenny Frank Dep. 17-19,

24.) Ms. Frank informed Ms. Shabareck that she (Ms. Frank) was falling behind in her own work

because she was pulling and prepping charts for Plaintiff at the end of each day. (Id. at  19-20,

25.)  This was not Ms. Frank's responsibility, nor a part of her regular job duties. (Id. at 25.)

Plaintiff was not Ms. Frank's supervisor and did not have authority to direct her work. (Id. at

23-24.). Ms. Frank stated that Plaintiff was "bossy." (Id. at 24-25).

      Jenny Ralph, a scribe for one of the doctors, confirmed that Ms. Shabareck reached out to

her and asked about problems with Plaintiff. (Jenny Ralph Dep. 15-17, 24-25, App. F, DE 43-1.)

As a scribe, Jenny Ralph had little direct interaction with Plaintiff.  (Id. at 12-13.)  Jenny Ralph

did describe a situation where Plaintiff told her where to place patient charts although this was

not within Plaintiff's scope of authority. (Id. at 13-15, 21-25.)  Jenny Ralph states that Plaintiff

was "bossy" and her demeanor less than respectful. (Id. at 19-21, 24.)  Jenny Ralph had the sense

that Plaintiff had a negative attitude and did not work well with others. (Id. at 18-19.)

---

[4] Plaintiff notes that while Ms. Shabareck testified that Plaintiff repeatedly asked Cindy
Ralph how much she was getting paid (Shabareck Dep. 96), Cindy Ralph stated Plaintiff asked
her about her salary on one occasion only (Cindy Ralph 19-20).

Tayna Cosme, a technician, testified that Ms. Shabareck asked her about Plaintiff's performance.  Ms. Cosme told Ms. Shabareck that she did not have many interactions with Plaintiff and was not able to comment on Plaintiff's performance. (Cosme Dep. 6-7, 12-13, Ex. 5, DE 54-5.)  Ms. Shabareck, however, testified, that Ms. Cosme told her that Plaintiff left her station for no reason and was disorganized and rude to co-workers.[5] (Shabareck Dep. 93.)

According to Plaintiff, she performed her job well and no one expressed dissatisfaction with her performance.  In fact, Plaintiff states that she received praise from both staff and patients from the outset of her employment through her last day. (Pl. Aff. ¶ 4.)  In addition, Plaintiff states that she got along well with her co-workers and was never rude, discourteous or bossy. (Id. at ¶ 5.)  Plaintiff also states that she never had a romantic interest in Mr. Leinhardt, nor did she ever comment on him in anything other than a professional manner. (Id. at ¶ 6.)

Plaintiff was served with a summons for federal jury duty service sometime during the week of May 23, 2011. (Pl. Dep. 1; Pl. Aff. ¶ 8.)  The summons was for a term of court commencing July 5, 2011. (Pl. Aff. ¶ 8.)  According to Ms. Borghese, Plaintiff told Ms. Borghese of the summons and that she was nervous about requesting time off because she was a new employee.  Ms. Borghese told Plaintiff that it is "not a big deal" as the same thing happened to her when she started with Defendant. (Borghese Dep. 10, 24). Specifically, she told Plaintiff that she (Ms. Borghese) started work with Defendant in February and received a summons for jury duty in April.  She reported her jury summons to Ms. Shabareck whose reply was "it's okay" and to send her a copy of the summons and submit a time off request.  (Id. at 25.)  Ms. Borghese

---

[5] Plaintiff notes that while Ms. Hudnall testified that employee Walli Santos complained about Plaintiff's attitude (Hudnall Dep. 32-33), Ms. Santos testified that she never spoke to Ms. Hudnall about Plaintiff (Santos Dep. 16-17, Ex. E, DE 54-6.)

was not paid for the day that she was off for jury service.  Ms. Borghese was still in her probationary period at the time (Interrogatory  ¶ 3, App. I, DE 43-1.) and she did not qualify for paid time for jury duty.  (Employee Handbook at 7.)

In contrast, Plaintiff states that she told Ms. Hudnall about the jury summons who stated something to the effect of, "Oh boy, that's not good, you better call [Ms. Shabareck]."  (Pl. Aff. ¶ 9.)  Plaintiff called Ms. Shabareck at the Stuart office to inform her of the jury summons. (Pl. Dep. 1.)  Plaintiff's testimony is that Ms. Shabareck told her that "this is a busy office," that Plaintiff should not be requesting time off and that Plaintiff needed to "get out of it." (Id. at 1; Pl. Aff. ¶ 10.)  Plaintiff believed that she would lose her job if she did not get out of jury duty, so she told Ms. Shabareck that she would see what she could do. (Pl. Aff. ¶ ¶ 12-13.)  Plaintiff believes that conversation took place on May 25, 2011. (Pl. Aff. ¶ 9.)

Discovery reveals an intra-office email exchange on May 25, 2011 between Ms. Hudnall and Ms. Shabareck wherein Ms. Hudnall writes that "Amy is going to make me (sic) slit my wrists." (May 25, 2011 email, App. K, DE 43-1.)  Plaintiff states she never had any disagreements with Ms. Hudnall. (Pl. Aff. ¶ 11.)  After the email was sent and Ms. Hudnall was no longer an employee of Defendant, Ms. Hudnall told Ms. Shabareck for the first time about the problems with Plaintiff. (Hudnall Dep. 35, 38-39; Shabareck Dep. 74.)

 Conversely, Ms. Shabareck's testimony is that she simply said for Plaintiff to fax her a copy of the jury summons so that it could be put in Plaintiff's file.  (Shabareck Dep. 5.). Plaintiff testified that she never attempted to get out of jury duty and that she never considered attempting to get out jury duty.  (Pl. Dep. 2.)  However, Plaintiff did wait until the last possible day to complete the registration, hoping by doing so that the Court would have enough jurors. (Pl. Aff. ¶

14.)  The Court informed Plaintiff to report for a two-week term on July 5, 2011. (Pl. Aff. ¶ 15.)

On June 6, 2011, Plaintiff faxed the confirmation of jury duty to Ms. Shabareck and followed up

by sending the confirmation through inter-office mail. (Pl. Aff. ¶ 16.)  The next time she saw Ms.

Shabareck, on June 13, 2011, she stated to Ms. Shabareck that she was unable to get out of jury

duty.[6] (Pl. Dep. 4.)  According to Plaintiff, Ms. Shabareck ignored her and walked away. (Pl. Aff.

¶ 18.)  Thirty minutes later, Plaintiff claims that Ms. Shabareck terminated her employment. (Id.

at ¶ 19.)

Specifically, Ms. Shabareck informed Plaintiff that a decision had been made to let her go

at a meeting with her in the West Palm Beach office on June 13, 2011.  (Plaintiff's Dep. 5;

Shabareck Dep. 4-5.)  Ms. Shabareck testified that, when she terminated Plaintiff, she told her

that "it wasn't working out" whereas Plaintiff testified that she was told that she was not

"gelling" with the office. (Pl. Dep. 4; Pl. Aff. ¶ 21; Shabareck Dep. 5-6.)   Plaintiff states she had

never been advised there was a problem with her work performance. (Pl. Aff. ¶ 20.)

According to Mr. Leinhardt, Ms. Shabareck spoke to him about the conversations she had

with Ms. Hudnall and he requested a follow-up report following Ms. Shabareck's

communications with the office staff. (Leinhardt Dep. 10-11.)  Based on the follow-up report

(i.e., that Plaintiff was rude, inappropriate and improperly delegating her work responsibilities),

Mr. Leinhardt made the decision to terminate Plaintiff. (Id. at 11, 18, 25-26.)  Mr. Leinhardt

determined that the issues with Plaintiff were significant enough that he would not invest any

further time, energy or resources in an employee that was still in her probationary period.  (Id. at

---

[6] Plaintiff's affidavit states that she "confirmed" with Ms. Shabareck that she was obliged to go to jury duty. (Pl. Aff. ¶ 17.)

10

22.)  Mr. Lienhardt decided that Plaintiff would be terminated by Ms. Shabareck when she visited the West Palm Beach office on Monday, June 13, 2011. (Id at 24-25.)

In recent years, three other employees have been summoned for jury service. Brian Bernstein, a front desk person in Stuart, took off  work to fulfill his jury responsibility. (Leinhardt Dep. 33; Interrogatories ¶ 3, App. I.)  Ms. Borghese reported for jury service and was out of work for a half-day. (Borghese Dep. 24-25; Interrogatories ¶ 3.)  Ms. Shabareck was summoned for jury duty and was out of work for one day in March of 2011. (Interrogatories ¶ 3.)

Defendant moves for summary judgment on the following bases: (1) As a matter of law, Plaintiff was not a "permanent employee" under the Jury System Improvement Act ("JSIA"), 28 U.S.C. § 1875, and therefore is not protected by this statute; (2) Plaintiff has failed to make a prima facie case under JSIA because she cannot show that jury duty service was the "but-for" cause of her termination; (3) Defendant had legitimate reasons for terminating Plaintiff and (4) there is no evidence that Defendant's reasons were pretextual.

## II. Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant  is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for

11

its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted."  Anderson, 477 U.S. 242, 249-50.

III. Discussion

A.  Coverage under JSIA

The JSIA provides, in pertinent part, that "[n]o employer shall discharge, threaten to discharge, intimidate, or coerce any permanent employee by reason of such employee's jury service, or the attendance or scheduled attendance in connection with such service, in any court of the United States."  28 U.S.C. § 1875.  According to Defendant, Plaintiff cannot seek refuge under this statute because she was a probationary, and not permanent, employee during her entire tenure with Defendant.  In support, Defendant relies on Madison v. District of Columbia, 604 F. Supp. 2d 17 (D.D.C. 2009) ("Madison II") and Crowley v. Pinebrook, Inc., No. JKS 08-3427, 2010 WL 4963004 (D. Md. 2010).

In Madison II, the plaintiff, and four other employees, were hired for 13-month term appointments.  Madison II, 640 F. Supp. 2d at 18.  The plaintiff was selected for jury service in a four-month capital case and, upon her return to work, was informed her term would not be extended or renewed, although the other four employees had their contracts renewed.  Id. at 18-19.  The court stated that the literal definition of "permanent" is "continuing or enduring" or "not subject to fluctuation or alteration" and noted that a 13-term appointment might not meet that definition in "literal terms."  Id. at 20.   At the same time, the court "recognized that the unequivocal purpose of the Juror Act was to provide 'statutory protection to the employment status of federal jurors during the period of jury service.'"  Id.   The court considered the evidence that the employer regularly renewed its term employees and did in fact renew the other term employees.  Id.  Based on these facts, the Court held that the plaintiff's term appointment was indeed a "permanent" position for the purpose of JSIA. Id.

13

In <u>Crowley</u>, the court simply noted that the employee was a probationary employee during her tenure with the defendant and therefore may not be a "permanent" employee within the meaning of JSIA.  The court, however, did not resolve this issue because the employer did not raise coverage as a defense.  <u>Crowley</u>, 2010 WL 4963004, at *3 n.2.

In response, Plaintiff contends that because both probationary and non-probationary employees of Defendant are terminable at-will, neither employee has an expectation of permanent employment.  Plaintiff points to <u>Madison v. District of Columbia</u>, 593 F. Supp. 2d 278, 289 (D.D.C. 2009) ("<u>Madison I</u>") for support that "at-will" employees can be terminated at any time but still qualify for protection under JSIA.

Defendant, however, notes that there is a distinction between a probationary and permanent employee that has nothing to do with at-will employment.  Defendant also notes that the plaintiff in <u>Madison I</u> had full benefits, whereas in the instant case Plaintiff had no benefits.  Additionally, Defendant asserts that the cases relied upon by the court in <u>Madison I</u> involved at-will employees who were not identified as being in their probationary period. (Reply at 2.)

After careful consideration, the Court finds that the definition of a "permanent employee" under JSIA encompasses a probationary employee.  A permanent employee is one whose term of employment will continue as long as performance is acceptable (or until the contractual term of employment has expired).  This is in contrast to employment where it is understood from the outset that the employee is hired to fulfill a temporary need.[7]  A probationary employee fits this definition.  When an employee is hired and is required to complete satisfactorily a probationary

---

[7]  A temporary employee might include a seasonal worker or an employee covering for a worker on sick or maternity leave.

period, it is understood that the employment will continue unless the work performance was

unsatisfactory.  The fact that a probationary employee may not receive all the benefits of an

employee that has satisfactorily completed a probationary period is not controlling.  The critical

inquiry is the expectation of the parties at the outset of the employment relative to its

continuation.  The fact that a probationary employee may be terminated after, or even during, the

probationary period is of no moment.  An at-will employee who is clearly understood to be

permanent can be terminated at any time for any non-prohibited reason.  If the fact that the

employee can be terminated at any time was the controlling factor, then only employees with

contractual terms of employment would be considered permanent.[8]

Based on this definition, the Court denies, as a matter of law, Defendant's motion for

summary judgment on the basis that Plaintiff's probationary employment is not covered by JSIA.

B.  Evaluation of Plaintiff's JSIA claim

 Under the JSIA, a plaintiff alleging wrongful discharge by reason of jury duty service

must prove the jury duty was the "but-for" cause for the termination. Crowley, 2010 WL

4963004, at * 3 (citing Gross v. FBL Financial Services, Inc., 129 S. Ct. 2343, 2350 (2009)

(concluding that the ordinary meaning of a statute requiring that adverse action be taken "by

reason of" a protected activity requires the employee to prove that the protected activity was the

_____

[8] Of course, the determination of whether an employee is "permanent," may, at times, require a fact-specific inquiry. See, e.g., Madison II, 640 F. Supp. 2d at 20 (finding a term employee can be a "permanent employee" because there the court considered the evidence that the employer regularly renewed its term employees and did in fact renew the other term employees but did not renew the plaintiff's term). Obviously, "permanent" does not mean an appointment for life.  However, employment for a term of years would be considered permanent, whereas employment for a six (6) month term may require a factual inquiry.

"but-for" cause of the adverse action)).[9]  The Court need not consider Defendant's proffered

reason for Plaintiff's termination absent evidence it was because of her jury service.  Crowley,

2010 WL 4963004, at * 3.  "Proximal timing of the termination and the protected activity can

help rebut an employer's evidence of a legitimate reason for the termination," but it "must be

coupled with other evidence, which must be substantial where . . . the employer has provided

significant evidence of a legitimate reason for the termination."  To show the employer's reason

is pretextual, a plaintiff may point to "weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions" in the proferred explanation. Jackson v. Alabama State Tenure

Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005).  Importantly, "[a] reason is not pretext for

discrimination 'unless it is shown both that the reason was false, and that discrimination was the

real reason.'" Brooks v. County Com'n of Jefferson County, Ala., 446 F.3d 1160, 1163 (11th Cir.

2006) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

      Keeping this framework in mind, the Court finds that there are genuine issues of material

fact that preclude the entry of summary judgment for Defendant with respect to Plaintiff's prima

---

    [9] The U.S. Supreme Court's recent decision Gross stated that  "the Court has not
definitively decided whether" the McDonnell-Douglas evidentiary framework is appropriate in
the ADEA context. Gross, 129 S. Ct. at 2349 n.2.  However, after Gross, the Eleventh Circuit
continued to analyze ADEA claims under the McDonnell-Douglas framework. See, e.g., Richie
v. Industrial Steel, Inc., No. 10-10945, 2011 WL 1899570, at * 5 (11th Cir. May 19, 2011);
Hollins v. Fulton County, No. 10-10954, 2011 WL 1331978, at * 2 (11th Cir. April 7, 2011);
Cleveland v. Secretary of Treasury, 407 Fed. Appx. 386, 387 (11th Cir. 2011); but see Thomas v.
Humana Health Plan, Inc., No. 10-15120, 2012 WL 180881, at * 1 n.4 (11th Cir. Jan. 24, 2012)
(applying both the Gross and McDonnell-Douglas framework). Given that JSIA tracks the
language of the ADEA, the Court will apply the McDonnell-Douglas evidentiary framework to
the facts of this case. See Arnold v. Beth Abraham Health Svcs., Inc., No 09 civ 7932 (DLC),
2011 WL 2416877, at * 3-4 (S.D.N.Y. June 16, 2011) (applying McDonnell-Douglas evidentiary
framework to JSIA).  Notably, both parties apply the McDonnell-Douglas evidentiary
framework.

facie case, Defendant's proffered legitimate reason for Plaintiff's termination and Plaintiff's evidence of pretext.  The Court will take each in turn.

With respect to Plaintiff's prima facie case, there are factual questions that a reasonable fact finder could resolve in favor of Plaintiff.  To demonstrate this, the Court will highlight several pertinent facts, which taken in the light most favorable to Plaintiff and assumed to be true, demonstrate why summary judgment cannot be granted for Defendant.

Initially, Plaintiff received a jury summons sometime during the week of May 23, 2011. (Pl. Dep. 1; Pl. Aff. ¶ 8.)  According to Plaintiff, when she informed Ms. Hudnall, who was training her, about the summons  Ms. Hudnall responded, "Oh boy, that's not good, you better call [Ms. Shabareck]." (Pl. Aff. ¶ 9.)   When Plaintiff spoke to Ms. Shabareck on or about May 25, 2011, Plaintiff claims Ms. Shabareck told her that "this is a busy office," that Plaintiff should not be requesting time off and that Plaintiff needed to "get out of it." (Pl. Dep. 1; Pl. Aff. ¶ ¶ 9-10.)  Plaintiff believed that she would lose her job if she did not get out of jury duty, thus she told Ms. Shabareck that she would see what she could do. (Pl. Aff. ¶ ¶ 12-13.)

In addition, on that same day, Ms. Hudnall sent Ms. Shabareck an email wherein Ms. Hudnall writes that "Amy is going to make me (sic) slit my wrists." (May 25, 2011 email, App. K, DE 43-1.)  Significantly, it was not until Ms. Hudnall was no longer an employee of Defendant, and after she had sent the email, that Ms. Hudnall told Ms. Shabareck for the first time about the alleged problems with Plaintiff's work and interactions with other co-workers. (Hudnall Dep. 35, 38-39; Shabareck Dep. 74.)

Next, on June 6, 2011, Plaintiff faxed her confirmation of jury duty to Ms. Shabareck and followed up by sending the confirmation through inter-office mail. (Pl. Aff. ¶ 16.)  The next time

she saw Ms. Shabareck, on June 13, 2011, she stated to Ms. Shabareck that she was unable to get out of jury duty. (Pl. Dep. 4.)  According to Plaintiff, Ms. Shabareck ignored her and walked away. (Pl. Aff. ¶ 18.)  Thirty minutes later, Plaintiff claims that Ms. Shabareck terminated her employment. (Id. at ¶ 19.)

Based on these facts, a reasonable fact finder could conclude that Plaintiff was terminated because she did not get out of jury duty.[10]  Plaintiff claims Ms. Shabareck, her supervisor, told her to get out of jury duty and, several weeks after, when she told Ms. Shabareck that she was unable to get out of jury duty, Ms. Shabareck terminated within 30 minutes.  Moreover, a reasonable fact finder could also conclude that the email sent from Ms. Hudnall to Ms. Shabareck was in response to Plaintiff informing Ms. Hudnall about her jury service.[11]

To be sure, Defendant offers an entirely different account about how Plaintiff being

_____

[10] In her response memorandum, Plaintiff claims JSIA was violated not just because of her termination but because she suffered intimidation or coercion. (Resp. at 3.)  While Defendant claims she did not allege intimidation or coercion in the Complaint, the Complaint states "Defendant both threatened to dismiss the Plaintiff's employment because of her jury service obligations and when she was unable to get out of those obligations, [Defendant] dismissed Plaintiff."  (Compl. ¶ 24, DE 1.)  Plaintiff's affidavit stated that Ms. Shabareck's comment that Plaintiff should get out of jury duty indicated to Plaintiff that if she did not get out of jury duty, she would lose her job.  (Pl. Aff. ¶ 12.)  The Court finds this raises a factual issue as to whether Plaintiff was intimidated. Lucas v. Matlack Inc., 851 F. Supp. 231, 234 (N.D.W.Va. 1994) (the plaintiff at the summary judgement stage must present evidence of intimidation or coercion by the manager's statements); see also Hill v. Winn-Dixie Stores, Inc., 934 F.2d 1518, 1526-27 (11th Cir. 1991) (affirming the granting of the motion for judgment notwithstanding the verdict on a coercion/intimidation claim based on statements made by the defendant's representatives, which included prolonged anger by a supervisor and ongoing reprimands by the plaintiff's superiors).

[11] Based on this record evidence, the Court dismisses Defendant's argument that Plaintiff has no evidence other than timing to suggest jury service was the but-for reason for her termination. (Mot. at 8.)  Moreover, to the extent Defendant contends that Plaintiff's statements are contradictory about what Plaintiff told Ms. Shabareck, that too is an issue to be resolved by the fact finder. (Mot. at 8.)

summoned to jury duty was handled.  Indeed, Defendant points to completely contrary testimony.

Ms. Borghese testified that Plaintiff told her about the summons and that she was nervous about

requesting time off because she was a new employee.  In response, Ms. Borghese stated that it is

"not a big deal" as the same thing happened to her when she started with Defendant. (Borghese

Dep. 10, 24). Furthermore, Ms. Shabareck's testimony is that she simply said for Plaintiff to fax

her a copy of the jury summons so that it could be put in Plaintiff's file.  (Shabareck Dep. 5.)

Because the Court must refrain from credibility determinations and must view the facts in the

light most favorable to Plaintiff, the Court must accept Plaintiff's version of the facts.  See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("credibility determinations, the

weighing of evidence and the drawing of legitimate inferences from the facts are jury

functions."); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1531 (11th Cir.1987) (on a summary

judgment motion, the court may not weigh the credibility of the parties).  Instead, the Court

simply finds that the factual issues preclude the entry of summary judgment with respect to

Plaintiff's prima facie case.[12]

Similarly, there are factual issues regarding Defendant's proffered legitimate business

reason for terminating Plaintiff.  On one hand, Defendant points to testimony of Plaintiff's co-

workers who describe Plaintiff as inappropriate, difficult to work with and inept at her job duties.

_____

[12] Defendant's reply memorandum argues for the first time that Plaintiff cannot establish a prima facie case because it is undisputed that Mr. Lienhardt made the decision to terminate Plaintiff, whereas the retaliation claim is predicated entirely on Ms. Shabareck's alleged discriminatory animus. (Reply at 10.)  Assuming this to be true, that would not necessarily preclude Plaintiff's claim.  Cf. Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331 (11th Cir. 1999) ("a discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge").

(Hudnall Dep. 14-16, 18-20, 24-26, 34-38; Borghese Dep. 8-16, 18-23, 45-46; Cindy Ralph Dep. 12, 14-17, 19-20, 23-25, 28, 34; Frank Dep. 19-20, 23-25; Jenny Ralph Dep. 13-15, 18-25.) On the other hand, Plaintiff claims she performed her job well, continually received praise from staff and patients, and that no one expressed dissatisfaction with her performance. (Pl. Aff. ¶ 4.) She also states she got along well with her co-workers and was never rude, discourteous, bossy or inappropriate. (Id. at ¶¶ 5-6.)  Clearly, based on this conflicting testimony, the Court cannot render a ruling as a matter of law.

Next, with respect to pretext, the record evidence demonstrates factual questions as well. Plaintiff began her employment April 21, 2011 on a part-time basis and she became full-time on May 9, 2011. (Pl. Aff. ¶ 1.)  The movement from part-time to full-time employment may suggest to a fact finder that Defendant's claimed problems with Plaintiff's performance were pretextual. Moreover, even under Defendant's version of the facts, the only time Defendant addressed Plaintiff's work performance was when Ms. Hudnall, who was training Plaintiff, spoke with Plaintiff about her work performance. (Hudnall Dep. 15, 24-25.)  At no time, however, did Ms. Hudnall report these alleged problems to Ms. Shabareck. (Id. at 26.)  In fact, Ms. Shabareck did not address Plaintiff's performance until she terminated Plaintiff on June 13, 2011, despite the allegedly numerous complaints and problems with her performance.[13]  (Plaintiff's Dep. 4-5; Pl. Aff. ¶¶ 20-21; Shabareck Dep. 4-6.)

For these reasons, the Court denies Defendant's motion for summary judgment.

---

[13] Given this lack of performance review of Plaintiff by Defendant, the Court rejects Defendant's characterization of Plaintiff's pretext argument as relying on her "self-serving assessment of her own performance." (Reply at 9.)

IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that  Defendant Florida Vision

Institute's Motion for Final Summary Judgment (DE 42) is **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 7th day of May, 2012.

KENNETH A. MARRA
United States District Judge